MAXWELL, J.,
for the Court:
¶ 1. Five years after Richard Peterson’s divorce from his wife Josephine, health problems forced his retirement. Because his income had substantially decreased, he sought a reduction of his alimony obligation. And the chancellor granted a modification, reducing his periodic alimony from $2,500 to $1,800 per month. On appeal, Josephine insists any downward modification of alimony was inappropriate because Richard’s retirement was anticipated. However, Richard counters, arguing that not only were his disabling injuries and resulting retirement unforseen, but also the $700 reduction was simply not enough.
¶2. We agree with the chancellor that Richard’s unanticipated, health-based retirement was an after-arising, material change in circumstances. So an alimony modification and reduction was appropriate. But it is not apparent that the chancellor considered Richard’s ability to pay the decreased award, since the unchallenged figures representing each party’s income and expenses show Richard suffers an almost $1,000 monthly deficit after paying alimony. Thus, we must remand for the chancellor to consider Richard’s ability to pay this amount, or any amount of alimony, while maintaining as normal a life as possible with a decent standard of living.
Facts and Procedural History
¶ 3. On July 21, 2005, Richard and Josephine’s thirty-three-year marriage ended in divorce. The chancellor found there were irreconcilable differences between the couple and ordered Richard to pay Josephine $2,500 in monthly periodic alimony. At the time of the 2005 divorce, Richard (then fifty-eight years of age) worked full time as a civilian engineer with the Army Corps of Engineers in Vicksburg, Mississippi. According to Richard, he planned to work until he reached at least age seventy-five. But unexpected health problems forced him to retire at the age of sixty-four. (Richard’s doctor, Dr. Paul Pierce, testified at trial that Richard was totally and permanently disabled.) As a result, on October 19, 2010, Richard petitioned to reduce or terminate his alimony obligation.
¶ 4. On January 3, 2012, the chancellor entered an order decreasing Richard’s monthly alimony obligation from $2,500 to $1,800. Richard appealed, arguing the reduction was not enough. And Josephine cross-appealed, insisting Richard’s retirement was foreseeable, so the alimony obligation should not have been modified, or alternatively, that the reduced obligation should be affirmed.
Standard of Review
¶ 5. An award of “[ajlimony, if allowed, should be reasonable in amount, commensurate with the wife’s accustomed standard of living, minus her own resources, and considering the ability of the *257 husband to pay.” Gray v. Gray, 562 So.2d 79, 88 (Miss.1990) (emphasis added). “The amount of an alimony award is largely within the discretion of the chancellor^]” Magee v. Magee, 754 So.2d 1275, 1279 (¶ 7) (Miss.Ct.App.1999). Unless the chancellor is in manifest error and abused her discretion, we will not reverse. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss. 1993) (citing McEachern v. McEachern, 605 So.2d 809, 814 (Miss.1992); Cherry v. Cherry, 593 So.2d 13,19 (Miss.1991)).
Discussion

I. Chancellor’s Decision to Reduce Alimony Award

¶ 6. Because Josephine’s cross-appeal challenges the chancellor’s initial decision that an unforeseeable material change in circumstances occurred, we address it first.

A. Chancellor’s Ability to Modify

¶ 7. With respect to requests for modification of a previously ordered alimony award, chancellors are vested with general statutory authority to modify divorce decrees and make “new decrees as the case may require.” Miss.Code Ann. § 93-5-23 (Rev.2013). Within this broad authority is the more specific power to increase, decrease, or terminate periodic alimony payments. Hubbard v. Hubbard, 656 So.2d 124, 129 (Miss.1995). When asked to modify periodic alimony awards, chancellors must first determine if an unforeseeable and material change in circumstances occurred since entry of the initial divorce decree. Holcombe v. Holcombe, 813 So.2d 700, 703 (¶ 11) (Miss.2002). If not, modification is not permitted.
¶ 8. However, if a substantial unanticipated change has in fact occurred, the chancellor should then consider the Armstrong[1] factors to determine the appropriate amount of alimony. Holcombe, 813 So.2d at 703 (¶ 12) (citing Armstrong, 618 So.2d at 1280). In evaluating these factors when “deciding whether to modify periodic alimony,” chancellors should “compar[e] the relative positions of the parties at the time of the request for modification in relation to their positions at the time of the divorce decree.” Steiner v. Steiner, 788 So.2d 771, 776 (¶16) (Miss.2001) (citing Anderson v. Anderson, 692 So.2d 65, 72 (Miss.1997); Tilley v. Tilley, 610 So.2d 348, 353-54 (Miss.1992); Armstrong, 618 So.2d at 1280). As with any alimony consideration, the chancellor must consider the wife’s accustomed standard of living, less her own resources, as well as the husband’s ability to pay. Gray, 562 So.2d at 83.

B. Richard’s Unanticipated Retirement

¶ 9. Josephine argues the chancellor erred in finding Richard’s early retirement was unanticipated when they divorced in 2005. While Josephine is correct that the material change “must occur as a *258 result of after-arising circumstances of the parties not reasonably anticipated at the time of the agreement^]” Austin v. Austin, 766 So.2d 86, 90 (¶ 19) (Miss.Ct.App.2000), there is record evidence that Richard intended to work until he was seventy-five but was rendered disabled by a litany of unforseen serious health calamities.
¶ 10. After the divorce, Richard fell and broke his patella and had two knee surgeries. Also mentioned in the record are his multiple joint injuries and his recently developed degenerative arthritis in both hips, both knees, and left shoulder. And since the divorce, Richard has torn a bicep, developed spinal stenosis in his lower back, undergone a total hip replacement, and had rotator-cuff surgery.
¶ 11. The extreme pain he claims he has suffered has inhibited his ability to walk, requiring him to use a cane. Richard’s doctor testified that Richard was severely, permanently, and totally disabled, and that he would not be able to work again. Both Richard and his physician maintained that these health problems occurred after his divorce. From this, the chancellor determined Richard’s post-divorce health problems resulted in his unanticipated early retirement.
¶ 12. We have previously held that a payor’s retirement due to unforeseeable health issues constituted a material change sufficient to modify an alimony award. See Broome v. Broome, 75 So.3d 1132, 1140-41 (¶¶ 26-28) (Miss.Ct.App.2011); Clower v. Clower, 988 So.2d 441, 444-45 (¶ 9) (Miss.Ct.App.2008) (holding that husband’s retirement due to health problems and loss of income constituted a material change in circumstance, justifying a reduction in alimony). Because there is record support that Richard’s later-arising injuries forced his retirement, the chancellor did not abuse her discretion in finding that a material, unanticipated change in Richard’s circumstances had occurred since the divorce.

II. Amount of Modified Alimony Award

¶ 13. We next turn to Richard’s suggestion that the chancellor was wrong to not reduce his alimony by more than $700.
¶ 14. Permanent periodic alimony is “a substitute for the marital-support obligation.” Deborah H. Bell, Mississippi Family Law § 9.02[1] (2005). It arises from the duty of the husband to support his wife. McDonald v. McDonald, 683 So.2d 929, 931 (Miss.1996). “Consistent with Armstrong, a financially independent spouse may be required to support the financially dependent spouse in the manner in which the dependent spouse was supported during the marriage, subject to a material change in circumstances.” Rogillio v. Rogillio, 57 So.3d 1246, 1250 (¶ 11) (Miss.2011). But “alimony awards in excess [of] a spouse’s ability to pay are ‘per se unreasonable.’ ” Sheffield v. Sheffield, 55 So.3d 1142, 1145 (¶ 9) (Miss.Ct.App.2011) (quoting Yelverton v. Yelverton, 961 So.2d 19, 28 (¶ 18) (Miss.2007)).
¶ 15. Having found a material change, the chancellor correctly moved to the next step and considered the Armstrong factors, comparing the parties’ financial positions at the time of the modification request to their former positions when divorced. See Steiner, 788 So.2d at 776 (¶ 16). But the chancellor did not make any findings about Richard’s ability to pay. And on appeal, Richard suggests that even after the $700 alimony reduction, he still endures a monthly deficit and is unable to pay the reduced award.
¶ 16. From our review, it is obvious the chancellor performed a detailed financial analysis of the parties’ incomes and ex *259 penses, health and earning capacities, needs, assets, and tax consequences, as required. However, considering these unchallenged figures, it is not apparent from the record that Richard was financially able to pay the reduced alimony obligation.

A. Comparing Relative Incomes and Expenses

¶ 17. The primary and most tedious of the chancellor’s detailed financial comparisons concerned Richard’s and Josephine’s positions at both the time of divorce and at the time of the requested alimony reduction. The ultimate figures relied on by the chancellor — which neither party disputes — show that even after the reduced alimony award, Richard endures a nearly $1,000 monthly deficit.

1.Josephine’s 2005 Income and Expenses

¶ 18. When the couple divorced in 2005, Josephine worked part-time as a substitute teacher. Her total monthly gross income was $1,050. Josephine’s only deduction was $18.05 for Social Security, making her adjusted gross monthly income $1,031.95. Her monthly expenses were $2,865.22. After the chancellor ordered Richard to pay Josephine $2,500 per month in periodic alimony, she was left with a surplus of $666.78.

2.Richard’s 2005 Income and Expenses

¶ 19. In 2005, Richard was employed and receiving a salary as a civil engineer. He also received medical-disability income from the U.S. Army. Richard’s total monthly gross income was $9,162. After deductions, his adjusted gross income was $6,111. Figuring in his monthly expenses of $2,232.15 and his $2,500 period alimony obligation to Josephine, Richard was left with a surplus of $1,378.85.

3.Josephine’s 2012 Income and Expenses

¶ 20. At the time of the modification proceedings, Josephine rarely worked as a substitute teacher due to cut-backs. Her monthly income consisted of $120 from substitute teaching; $30 from dividends and interest; and $2,407.85 from the civil-service retirement ($2,499.50 was deducted from Richard’s income). Before alimony, Josephine’s total gross monthly income was $2,557.85. With the $2,500 periodic alimony awarded to her in the 2005 divorce, her total gross monthly income was $5,057.85.
¶ 21. The only deduction reported was $300 for federal income taxes. Thus, the chancellor determined that Josephine’s adjusted gross monthly income was $4,757.85, which included the $2,500 in periodic alimony. Josephine’s total monthly expenses were $3,616. Taking Josephine’s adjusted gross monthly income ($4,757.85, which included the $2,500 in periodic alimony), less her monthly expenses ($3,616), Josephine was left with a surplus of $1,141.85. After the chancellor granted a $700 reduction in alimony, Josephine was left with a surplus of $441.85.
J. Richard’s 2012 Income and Expenses
¶ 22. At the time of the 2012 modification hearing, Richard was retired. His monthly income consisted of $7,283.41 in civil service retirement, plus $1,479 in army retirement. So his total monthly gross income was $8,762.41.
¶ 23. There were various deductions for Josephine’s benefit: $201.30 for a life-insurance premium ($110,000 policy), $775 for a life-insurance premium ($496,800 option B policy), $2,499.50 in civil-service retirement ($2,407.85 of which was income to Josephine after Richard retired), $705.84 for the civil service survivor-annuity premium, and $94.41 for the army life-insurance premium. An additional $415.68 was deducted for Richard’s personal health-insurance premium. And Richard’s total monthly deductions were $4,691.73. So *260 Richard’s total adjusted gross monthly income was $4,070.68. And his claimed total monthly expenses were $3,209.
¶ 24. These deduction left Richard with a surplus of $861.68. But after factoring the recently reduced alimony obligation— $1,800 — Richard purportedly found himself with a monthly deficit of $938.32.

B. Richard’s Inability to Pay

¶25. While the chancellor may have indeed considered Richard’s financial ability to pay while suffering the apparent monthly deficit, she made no explicit mention of it. And we cannot determine that the chancellor implicitly considered Richard’s ability to pay, since the unchallenged figures representing each party’s income and expenses show Richard endures an almost $1,000 monthly deficit after paying alimony.
¶ 26. Because “alimony awards in excess [of] a spouse’s ability to pay are ‘per se unreasonable,’ ” Sheffield, 55 So.3d at 1145 (¶ 9), we remand for the chancellor to consider Richard’s ability to pay this amount, or any amount of alimony, while maintaining as normal a life as possible with a decent standard of living. See Brendel v. Brendel, 566 So.2d 1269, 1272 (Miss.1990).
¶ 27. THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT IS REVERSED AND REMANDED ON DIRECT APPEAL AND AFFIRMED ON CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON AND FAIR, JJ., CONCUR. JAMES, J., NOT PARTICIPATING.

.The Armstrong factors are:
1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence and absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.
Armstrong, 618 So.2d at 1280.